**LEONARDMEYER LLP**
Derek J. Meyer (CA Bar No. 278346)
1800 Century Park East, Suite 1400
Los Angeles, CA 90067
Tel: (310) 220-0331
rmeyer@leonardmeyerllp.com

**LEONARDMEYER LLP**
John G. Bisbikis (admitted *pro hac vice*)
Madelaine M. Thomas (admitted *pro hac vice*)
120 North LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (310) 374-8084
jbisbikis@leonardmeyerllp.com
mthomas@leonardmeyerllp.com

*Attorneys for Plaintiff Nanografix
Corporation*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| NANOGRAFIX CORPORATION, a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> POLLARD BANKNOTE LIMITED, a Canadian corporation, <br><br> Defendant. | 2:18-cv-06735-GW-RAO <br><br> **PLAINTIFF NANOGRAFIX CORPORATION'S RESPONSE IN OPPOSITION TO DEFENDANT POLLARD BANKNOTE LIMITED'S MOTION TO TRANSFER TO THE EASTERN DISTRICT OF MICHIGAN** <br><br> Judge:        Hon. George H. Wu <br> Hearing Date:  December 17, 2018 <br> Hearing Time: 8:30 a.m. <br> Courtroom:    9D |

Plaintiff Nanografix Corporation ("Nanografix") respectfully submits this Response in Opposition ("Opposition") to Defendant Pollard Banknote Limited's ("Pollard") Motion to Transfer ("Motion") to the Eastern District of Michigan brought pursuant to 28 U.S.C. § 1404(a).

## I.   INTRODUCTION

Nanografix is a small California corporation. Its 2018 revenues through October 31, 2018 were approximately $290,000. Its owner, a California resident, is also one of the inventors of Nanografix's U.S. Patent No. 6,443,494, entitled "Removable Optical Security Film Placed on Printed Surfaces and/or Products Containing Such Film" ("the '494 Patent").

Pollard acknowledges in its Motion that it is a Canadian Company based in Winnipeg, Manitoba, Canada.  According to Pollard's 2017 Annual Report, "Pollard Banknote Limited ('Pollard') is one of the leading providers of products and services to lottery and charitable gaming industries throughout the world. Management believes Pollard is the largest provider of instant-win scratch tickets ('instant tickets') based in Canada and the second largest producer of instant tickets in the world." (Declaration of Derek Meyer ("Meyer Decl."), ¶ 3 and Exhibit A, p.3 thereto). Pollard's 2018 sales through September 30, 2018 were $261 million (Canadian Dollars), and its Adjusted EBITDA for the same period was $41.2 million CD. (Meyer Decl. ¶ 4 and Exhibit B, p.3 thereto).

On August 6, 2018, Nanografix filed its Complaint against Pollard alleging, *inter alia*, that Pollard infringes the '494 Patent. (Dkt. No. 1). Specifically, Nanografix has accused instant-win scratch lottery tickets that Pollard makes, uses, sells and offers for sale under the trademark "Scratch FX" ("Accused Tickets") of infringing the '494 Patent. (Dkt. 1, ¶¶ 6, 27). Scratch FX is a "a patented Pollard Banknote printing feature that adds sparkling effects to enhance an instant ticket's visual appeal." (Meyer Decl. ¶ 5 and Exhibit C thereto). The patent Pollard associates with its Scratch FX products is U.S. Patent No. 7,455,323 ("the '323 Patent"). (*see, e.g.,*

Meyer Decl. ¶ 13 and Exhibit K thereto). The face of the '323 Patent lists all of the inventors as having Canada as their residence. (Meyer Decl. ¶ 6 and Exhibit D thereto).

Pollard's relationship with the California Lottery dates back to 1997. (Meyer Decl. ¶ 20 and Exhibit R thereto). Currently, Accused Tickets bearing the Scratch FX trademark and referencing the '323 Patent on the reverse side of the ticket are being offered and sold to California consumers in a California Lottery "Scratchers" game called "Holiday Sparkle." As further stated on the reverse side of the California Lottery's Holiday Sparkle instant lottery tickets, these tickets were "Made in Canada" by Pollard. Pollard's Motion ignores these Accused Tickets. Accused tickets are, will be or have also been sold to consumers in, at a minimum, Michigan, Maryland, Texas, Iowa, Idaho, and Virginia. (Meyer Decl. ¶¶ 5,7-12, 15-18).

Pollard does not dispute that venue is proper in the Central District of California. Yet it moved to transfer this case to the Eastern District of Michigan on November 6, 2018. (Dkt. No. 26). Pollard's Motion disregards the disparities in the parties' sizes and the significant burdens that would be imposed on Nanografix in the event that Nanografix's choice of its home state, California, is disturbed and it is forced to continue this case in Michigan, a forum in which it has no contacts.

Much of Pollard's Motion is devoted to arguing that Nanografix's home district is the Southern District of California and not the Central District of California, and that this somehow warrants disturbing Nanografix's choice of forum. Unlike the instant matter, neither of the two cases Pollard cites where the courts refused to grant deference to the plaintiffs' choice of venue involved California companies as the plaintiff.

Pollard also seeks a transfer based on its argument that the "center of gravity of the accused activity" lies in Ypsilanti, Michigan. It is undisputed, however, that Pollard's "accused activities" have also taken place in Winnipeg. Further, Pollard has omitted any meaningful inventory of such activities emanating from Winnipeg in its

Motion and, in contrast, has offered more details regarding the degree of accused activity in Ypsilanti in an effort to draw the Court's focus to Ypsilanti. As shown below, it appears Winnipeg, Canada is the "center of gravity of the accused activities" or, alternatively, Pollard has failed to meet its burden of showing that Ypsilanit is the center of gravity.

Indeed, Pollard's Motion is premised on an artificial and incorrect temporal restriction based on an October 29, 2018 report and recommendation of a Magistrate Judge from the District of Arizona. (Dkt. 26-1, at 17-24).  It contends that "for purposes of determining whether to transfer, the Court considers the facts that existed at the time the case was brought." *Id.* (citing *Nikola Corp. v. Tesla Incorporated,* No. CV-18-01344-PHX-JAS (BPV)). This is simply wrong and the Court can most assuredly consider any later facts as shown below.

Nevertheless relying on its erroneous *Nikola* standard, Pollard offers the Declaration of Raymond Darrell Ward ("Ward Decl.") for the propositions that "[a]s of the time of the filing of the complaint in this action, and to the best of my knowledge, all Scratch FX tickets sold in the United States were manufactured in [Pollard's] Ypsilanti [, Michigan] facility" and "Pollard's Scratch FX tickets are not currently available to consumers in the California market and as of the filing of the complaint in this action, no Scratch FX tickets had been manufactured for the California State Lottery."  (Ward Decl. ¶¶3, 10). These averments skirt the Holiday Sparkle game referenced above.   Mr. Ward's averments and Pollard's related arguments submitted to the Court on November 6, 2018 thus do not consider the following information: (1) Pollard had most assuredly already manufactured Scratch FX Tickets for the California Lottery for the Holiday Sparkle game as of November 6, 2018, (2) those tickets would become, and did become, available for California residents to purchase on November 14, 2018, the date the Holiday Sparkle game commenced according to the California Lottery's website, and (3) the Holiday Sparkle tickets were "Made in Canada" by Pollard.  This breathes even greater life

4

1  into the conclusion that Pollard's assertions regarding the "center of gravity" in this

2  case deserve little weight and fail to satisfy its burdens.

3    Pollard's remaining arguments as addressed below are similarly unavailing.

4  Nanografix's choice of venue is entitled to great deference and the parties and the

5  claims in this action have strong ties to the State of California.  Nanografix is a small

6  company compared to Pollard.  Pollard is not contending that Nanografix is a troll or

7  that Nanografix is forum shopping.  Nanografix also faces greater hardships if the

8  action is transferred to the Eastern District of Michigan as compared to Pollard if the

9  action proceeds in the Central District of California.  The interests of justice also favor

10 proceeding in the Central District of California, as it generally takes more than twice

11 as long for patent cases to reach trial in the Eastern District of California compared to

12 this District.  For these reasons and the reasons stated below, the Motion should be

13 denied.

14 **II.**   **BACKGROUND**

15     **A. Nanografix Has Deep Ties to California and None to Michigan**

16   Nanografix is a California corporation. (Declaration of Daniel Lieberman

17 ("Lieberman Decl."), at ¶ 3); (Meyer Decl. ¶ 19 and Exhibit Q thereto). Nanografix

18 was formed in December 2010 as U.S. Holografix Corporation, Inc. (Lieberman Decl.

19 ¶ 3); (Meyer Decl. ¶ 19). The company changed its name to Nanografix Corporation

20 in August 2013. (Lieberman Decl. ¶ 3); (Meyer Decl. ¶ 19).

21   Nanografix sells security hologram products for use by manufacturers,

22 retailers, pharmaceutical companies, corporations, and Governments. Nanografix's

23 hologram products help its customers prevent counterfeits and protect brand identity.

24   Nanografix is a small company with annual revenues in 2017 of less than

25 $440,000. In 2018, Nanografix's revenues through October 2018 were approximately

26 $290,000. (Lieberman Decl. ¶ 5).

27

28

Nanografix has over 15 customers in California, including approximately 8 customers in Los Angeles County, California.  Nanografix also stores products in California and ships them to customers from California. (Lieberman Decl. ¶ 6).

On or about August 30 and 31, 2018, Nanografix also attended a trade show in Los Angeles, California known as "The BIG Industry Show California" at the Los Angeles Convention Center to promote its products. (Lieberman Decl. ¶ 7).

Nanografix's President is Daniel Lieberman. (Lieberman Decl. ¶ 1). He lives in Carmel Valley in San Diego, California, in a home he has owned since 1998. (Lieberman Decl. ¶ 9). He is also one of the named inventors of the '494 Patent. (Lieberman Decl. ¶ 2).

Nanografix currently operates without any physical office space, and like many small business owners, Mr. Lieberman primarily works from his home. (Lieberman Decl. ¶ 9).

Nanografix uses the address of 3830 Valley Center Dr., Suite 705 PMB 582, San Diego, California 92130 as the company business address and to receive mail. That address is a secure, private mailbox at Postal Annex. (Lieberman Decl. ¶ 10). Nanografix has used this mailbox address since it was incorporated. (Lieberman Decl. ¶ 10). The mailbox is located near Mr. Lieberman's home office, and is convenient for him to use for Nanografix business. (Lieberman Decl. ¶ 10).

As recently as September 2017, Nanografix leased office space at 12526 High Bluff Drive Suite 300, San Diego, California for its operations. (Lieberman Decl.   ¶ 8). Mr. Lieberman determined, however, that maintaining a leased office space was not necessary for it to operate as a business. Its employees instead work from their homes, saving Nanografix the expenses associated with leased office space. (Lieberman Decl. ¶ 8).

Nanografix has five employees, all of whom are family members of Mr. Lieberman. (Lieberman Decl. ¶ 11). All three of Nanografix's full time employees live in California. One part time employee lives in Los Angeles, California.

1  (Lieberman Decl. ¶ 11).  Nanografix also has two independent contractors, both of
2  whom live in California. (Lieberman Decl. ¶ 12).

3      Nanografix maintains a storage facility in San Diego, California where it stores
4  records, including its records relating to the '494 Patent not otherwise stored
5  electronically. (Lieberman Decl. ¶ 14). To the best of Mr. Lieberman's knowledge,
6  Nanografix does not maintain any records related to the '494 Patent in Mexico.
7  (Lieberman Decl. ¶ 14).

8      Since about 1984, Mr. Lieberman has owned a company in Mexico called
9  Hologramas de Mexico ("HoloMex").  In 1998 Mr. Lieberman started another
10  company called Holowebs, LLC in California.  From 1998 to at least 2000, Mr.
11  Lieberman was traveling frequently between these companies in California and
12  Mexico and invented the '494 Patent at least in part, in California. (Lieberman Decl.
13  ¶ 16).

14      Nanografix has no operations in Michigan. (*See* Lieberman Decl. ¶ 6).
15  Nanografix has made no sales to customers in Michigan. (*See* Lieberman Decl. ¶ 6).

16      The expenditures Nanografix is, and will be, making in connection with this
17  lawsuit are material to Nanografix in light of its modest revenues. (Lieberman Decl.
18  ¶ 17). Maintaining this lawsuit in Los Angeles instead of San Diego is less costly for
19  Nanografix. Mr. Lieberman was referred to Derek J. Meyer of LeonardMeyer LLP by
20  a lawyer in the San Diego area, and Mr. Meyer's main office is located in Los
21  Angeles, California, where he resides.  It is less expensive for Nanografix, a company
22  of limited financial means, for Mr. Meyer to attend all hearings and any trial in Los
23  Angeles than it would be had this case been filed in the Southern District of California.
24  (Lieberman Decl. ¶ 17).

25      Further, transferring this case to the Eastern District of Michigan will add
26  additional strain on Nanografix's limited financial resources.  Additional expenditures
27  will include the retention of local counsel and the travel costs associated with having

28

Mr. Meyer and Mr. Lieberman attend hearings and trial in Michigan. (Lieberman, Decl. ¶ 18).

### B. Pollards Has Significant Financial Means to Litigate Here And Does Significant Business in California

Pollard is a Canadian company with its principal place of business located in Winnipeg, Manitoba, Canada.  According to Pollard's 2017 Annual Report:

> Pollard Banknote Limited ("Pollard") is one of the leading providers of products and services to lottery and charitable gaming industries throughout the world. Management believes Pollard is the largest provider of instant-win scratch tickets ("instant tickets") based in Canada and the second largest producer of instant tickets in the world.

(Meyer Decl. ¶ 3, p. 3).

Pollard employs almost 1600 employees at over 6 locations, including 3 locations in Canada (Winnipeg, Manitoba; Barrhead, Alberta; and Sault Ste. Marie, Ontario) and 3 locations in the United States (Ypsilanti, Michigan; Council Bluffs, Iowa; and Chatsworth, California.) (Meyer Decl. ¶ 3, p. 28).

Pollard's 2017 total revenues exceeded $285 million (Canadian dollars). (Meyer Decl. ¶ 3).  Pollard's revenues are up substantially in 2018. Through the three calendar year quarters ending on September 30, 2018, its revenues are up over 27% compared to the same period in 2017 and exceed $261 Million (Canadian Dollars). (Meyer Decl. ¶ 4, p. 1). Its Adjusted EBITDA of $41.2 million CD through September 30, 2018 is also up over 33% compared to the same period in 2017. (Meyer Decl. ¶ 4, p. 1).

There is nothing inconvenient about California in terms of Pollard's ability and desire to conduct business in California. For example, Pollard has had a relationship the California Lottery dating back to 1997. (Meyer Dec. ¶ 20). In a 2013 press release, Pollard touted that revenue generated from two of its games, Crossword and Bingo, accounted for more than 20% of the California Lottery's total instant ticket sales in fiscal year 2013. (Meyer Dec. ¶ 20). In that press release, Pollard also claimed that it

8

launched a game called Tripling Crossword that, as of December 2013, had generated more than $955 million in total sales – making it the top selling Crossword game of all time in California. (Meyer Dec. ¶ 20). More recently, in a 2015 press release, Pollard touted that its "Deluxe 7's Playbook has had cumulative sales that are 20% ahead of the Lottery's last two games launched at the $20 price point – adding $43.7 million (USD) to California's instant ticket sales!" (Meyer Decl. ¶ 21 and Exhibit S thereto).

Pollard currently has a contract with the California Lottery to produce California Scratchers games. The contract was signed on or around November 18, 2013. (Dkt. 1 ¶ 21, Dkt. 25 ¶ 21.) The initial term of the agreement is from December 1, 2013 through November 30, 2019. (Dkt. 1 ¶ 22, Dkt. 25 ¶ 22.) The contract has a maximum amount of $50,000,000 for the initial term. (Dkt. 1-2, p.3.) The contract was signed by Doug Pollard out of Winnipeg, Canada. (Dkt. 1-2, p. 3.)

Pollard registered with the California Secretary of State Office to do business in the State of California in or about March 2013. (Meyer Decl. ¶ 22 and Exhibit T thereto). Pollard's most recent California Secretary of State filing was in March 2017.[1] (Meyer Decl. ¶ 22).

Pollard also has a wholly-owned subsidiary called Diamond Game Enterprises, whose headquarters are in Los Angeles, California. (Meyer Decl. ¶ 24 and Exhibit V thereto). Pollard completed the acquisition of Diamond Game in 2017 at a purchase price that valued Diamond Game at $51 Million. (Meyer Decl. ¶ 25 and Exhibit W thereto).

---

[1] The California Secretary of State Office's website currently shows Pollard's status as "FTB Forfeited" indicating that Pollard was suspended or forfeited by the Franchise Tax Board for failure to meet tax requirements. (Meyer Decl. ¶ 23 and Exhibit U thereto).

1    Pollard's 2017 Annual Report also indicates that Pollard has a manufacturing
2    facility in Chatsworth, California, which is in the Central District of California.
3    (Meyer Decl. ¶ 3).

4        **C. Pollard's Scratch FX Products**

5        The tickets that have been accused of infringement in this case are sold by
6    Pollard under its "Scratch FX" trademark.  On its website, Pollard has stated that
7    "Pollard Banknote's patented Scratch FX® adds sparkle and shine to instant tickets
8    for a visual appeal and brilliance that exceeds that of foil, holographic foil and metallic
9    inks, and drives sales by making tickets stand out at retail." (Dkt. 1-3). Pollard refers
10   to its Scratch FX tickets as one of its "higher value proprietary games." (Meyer Decl.
11   ¶ 4, p.1).

12       Pollard marks its Scratch FX tickets with its own patent number, U.S. Patent
13   No. 7,455,323. (*See, e.g.*, Meyer Decl. ¶¶ 13,15-16). The '323 Patent lists 5 inventors,
14   namely, Brett Charles Taylor, Tyson D. Kaus, Michel John Brickwood, Greg
15   Hamilton and Lyle Harold Scrymgeour, all of whom are identified on the patent as
16   being Canadian residents. (Meyer Decl. ¶ 6, p. 1).

17       Pollard contends that its Scratch FX products have collectively contributed over
18   $2 billion in retail sales to participating jurisdictions. (Dkt. 1-3). As of 2017, Pollard
19   stated that at least 28 lotteries worldwide have launched a total of 171 Scratch FX
20   offerings.  (Dkt. 1-3).

21       Pollard sells Scratch FX tickets in at least the states of California, Michigan,
22   Texas, Maryland, Arizona, Iowa and Idaho.  (Meyer Decl. ¶¶ 4-5, 7-18, 20-21).
23   Pollard claims that it sells the most Scratch FX tickets in Michigan, but it is difficult
24   to consider this assertion in a vacuum.  For example, in its Motion does not make any
25   effort to identify all the states in which Scratch FX tickets are sold or the total sales
26   of such tickets in Michigan or any other state.

27       Accused Tickets (i.e., Scratch FX tickets as noted above) are available to
28   consumers in California and in this District.  For example, the "Holiday Sparkle"

10

game is available to California consumers.  (Meyer Decl. ¶ 13 and Exhibit K thereto). The back of the "Holiday Sparkle" game ticket indicates that it is a Pollard "Scratch FX" ticket, and states that it was "Made in Canada."  (Meyer Decl. ¶ 13). Mr. Meyer purchased the Holiday Sparkle ticket attached to his Declaration in Santa Monica, California on or about November 20, 2018.

The "Holiday Sparkle" game was launched in California on or around November 14, 2018. (Meyer Decl. ¶ 28 and Exhibit Z thereto). The California State Lottery webpage indicates that the chances of winning one of the six $1,000,000 prizes is 1 in 1,236,000 which means that approximately 7,416,000 "Holiday Sparkle Tickets" are or will be sold to the California Lottery for sale to California consumers. (Meyer Decl. ¶ 14 and Exhibit L thereto).

## II.   The Standard for a Motion to Transfer

### A. General Standards

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  35 U.S.C. § 1404(a).  The proposed transferee district must be one in which the plaintiff had the right to sue at the time that the action "might have been brought."  *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960).  In a patent case, motions to transfer under 28 U.S.C. § 1404(a) are governed by the law of the regional circuit in which the district court sits.  *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008) (citation omitted). Just as Pollard does not dispute that venue is proper in this District, Nanografix also does not dispute that venue in this

1  action would have been proper in the Eastern District of Michigan pursuant to the

2  general venue statute, 28 U.S.C. §1391.[2]

3      "Section 1404(a) is intended to place discretion in the district court to

4  adjudicate motions for transfer according to an individualized, case-by-case

5  consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487

6  U.S. 22, 29 (1988) (internal quotation omitted).  The moving party, Pollard, bears the

7  burden of demonstrating that transfer is appropriate. *Jones v. GNC Franchising, Inc.*,

8  211 F.3d 495, 499 (9th Cir. 2000).  Jones identified several criteria that district courts

9  may consider in determining whether a moving party has met this burden:

> The location where the relevant agreements were negotiated and
> executed, (2) the state that is most familiar with the governing law,
> (3) the plaintiff's choice of forum, (4) the respective parties' contacts
> with the forum, (5) the contacts relating to the plaintiff's cause of
> action in the chosen forum, (6) the differences in the costs of litigation
> in the two forums, (7) the availability of compulsory process to
> compel attendance of unwilling non-party witnesses, and (8) the ease
> of access to sources of proof.

16      *Id.* at 498-99.

17      "[T]hese factors cannot be mechanically applied to all types of cases" and

18  should be considered "under the statutory requirements of convenience of witnesses,

19  convenience of parties, and the interests of justice." *Signal IP, Inc. v. Ford Motor*

20  *Co.*, No. 14-cv-3133, 2015 WL 5766170, at *2 (C.D. Cal. Jan. 20, 2015).  In light of

21  the statutory purpose of § 1404(a), district courts have the "discretion to adjudicate

22  motions to transfer according to an individualized, case-by-case consideration of

23  convenience and fairness." *Id.* at 494 (quoting *Stewart Org., Inc*, 487 U.S. at 29)

---

[2] Pollard's discussion concerning whether venue would be proper in this District under
the patent venue statue (28 U.S.C. § 1400(b)) is not relevant to the analysis concerning
transfer under 28 U.S.C. § 1404(a).  Pollard cites no authority indicating that a court
may consider as a factor in determining convenience whether or not venue would be
proper under one or more venue statutes.

(internal quotation omitted). As a result, this Court may also assess the relative size of the parties' businesses when deciding a transfer motion. *Digitech Image Technologies, LLC v. Leica Camera AG*, No. 12-01677, 2012 WL 6062749, at *2 (C.D. Cal. Dec. 5, 2012).

Finally, "[i]f the gain to convenience to one party is offset by the added inconvenience to the other, the courts have denied transfer of the action." *STX, Inc. v. Trik Stik, Inc.*, 708 F. Supp. 1551, 1555-56 (N.D. Cal. 1988).

## B. The Court's Inquiry Is Not Constrained By The Date Nanografix Filed Its Complaint

As noted, Pollard contends that "for purposes of determining whether to transfer, the Court considers the facts that existed at the time the case was brought." (Dkt. 26-1, at 1, 3) (citing *Nikola Corp. v. Tesla Incorporated,* No. CV-18-01344-PHX-JAS (BPV), at *1 n. 1 (D. Ariz. Oct. 29, 2018); *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013)). The *Nikola* decision was an October 29, 2018 Report and Recommendation of a Magistrate Judge in the District of Arizona recommending that the District Court grant a motion to transfer. (Dkt. 26-5). There, the court cited *Ventress v. Japan Airlines*, 486 F.3d 1111, 1118 (9th Cir. 2007) and *In re EMC Corp.*, 501 F. App'x 973, 976 (Fed. Cir. 2013) as the lone support for this alleged standard. *Nikola Corp. v. Tesla Incorporated,* No. CV-18-01344-PHX-JAS (BPV), at *3.

*Ventress* provides no support for the standard Pollard seeks to apply by citing *Nikola*. *Ventress* simply made the common sense observation that "the district court could not have abused its discretion by not considering events that had not taken place at the time of its decision." *Ventress*, 486 F.3d at 1118. Nowhere in *Ventress* did the Ninth Circuit confine the district court's analysis to the facts that existed at the time the case was brought.

Nor does *In re EMC Corp.*, 501 F. App'x 973 (Fed. Cir. 2013) support the *Nikola* standard Pollard advocates. There, the Federal Circuit explained that when considering the judicial economy factor in connection with a motion to transfer, the

13

1    district court could not consider the judicial economy it gained from presiding over

2    the same suit prior to ruling on the motion to transfer. *Id.* at 976.

3        Plainly, the Arizona court erred and did not properly apply Ninth Circuit

4    precedent when it, like Pollard here, cited *Ventress*. In fact, on page 14 of its Motion,

5    Pollard cites *Qurio Holdings, Inc. v. DISH Network Corp.,* No. 15-CV-00930, 2015

6    WL 4148962 (N.D. Cal. July 9, 2015) on a different issue. In contrast to Pollard's

7    apparent desire to avoid any consideration of Pollard's Accused Tickets currently on

8    sale in California and "Made in Canada," the *Qurio* court "consider[ed] the facts as

9    they exist now" and explained that it "need not 'confine its venue consideration to the

10   facts as they existed at the time of the complaint." *Id.* at *3 (quoting *In re Fine Paper*

11   *Antitrust Litig.*, 685 F.2d 810, 819 (3d Cir. 1982)).

12       Respectfully, this Court should reject Pollard's efforts to artificially limit this

13   Court's consideration of all relevant facts presented in the Motion and this Opposition

14   based on its reliance on a clearly erroneous decision of a Magistrate Judge in another

15   District issued just one week before it filed its Motion.

16   **III.   This Case Should Not Be Transferred to Michigan**

17       Nanografix next addresses the standards and factors referenced above.

18   **A. Where the Relevant Agreements Were Negotiated and Executed**

19   Nanografix's Complaint attached the contract that Pollard entered with the

20   California Lottery in which Pollard offered to sell Accused Tickets to the California

21   Lottery. (Dkt. 1-2). Pollard is selling Accused Tickets, i.e., the Holiday Sparkle

22   tickets, in California and this District pursuant to that agreement. (Meyer Decl. ¶ 13).

23   The person who entered this agreement on behalf of Pollard is located in Winnipeg,

24   and Pollard's California Lottery team also appears to be based in Canada.

25       In contrast, Pollard has made no showing in its Motion on this point regarding

26   any other contract outside of California and has waived the issue. *Downey Surgical*

27   *Clinic, Inc. v. Ingenix, Inc*., No. CV 09-5457, 2013 WL 12114070, at *7 (C.D. Cal.,

28

2013) (for the sake of fairness to plaintiffs, defendants waive any argument raised for the first time in their Reply). This factor therefore weighs against transfer.

**B. Familiarity with the Governing Law**

As Pollard suggests in its Motion with its citation to *Qurio Holdings,* 2015 WL 4148962, at *6, this factor is neutral given that this is a patent case.

**C. Plaintiff's Choice of Forum**

As noted above, Nanografix filed this case in the Central District of California which: (1) is in the home state of one of the inventors of its '494 Patent, (2) near its principal place of business, (3) less expensive for it to litigate, (4) a District in which Accused Products are being sold, (5) in a State with which the defendant enjoys a long-time contract that relates to the sale of Accused Products to the California Lottery, and (6) and a District in which Pollard also has a subsidiary and a manufacturing plant.

"The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986); *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 278-79 (9th Cir. 1979) ("[t]he defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum."); *Directv, Inc. v. EQ Stuff, Inc.*, 207 F. Supp. 2d 1077, 1082 (C.D. Cal. 2002) ("[t]here is a strong presumption in favor of the plaintiff's choice of forum." ).

Citing *Fontem Ventures B.V. v. R.J. Reynolds Vapor Co.*, No. CV 16-2286-GW (MRWX), 2016 WL 7496721 (C.D. Cal. Aug. 8, 2016) and *Lou v. Belzberg,* 834 F.2d 730 (9th Cir. 1987), Pollard claims that Nanografix's choice of forum is entitled to no deference because the Central District is not Nanografix's home forum and has little connection to the operative facts in the case. (Dkt. 26-1, at 10). *Fontem* is a drastically different case. There, this Court transferred a patent case to the Middle District of North Carolina when the plaintiffs were companies organized under the laws of The Netherlands with principal places of business in Amsterdam, all of their witnesses

were located overseas, and one of the plaintiffs and its parent company also maintained an office in North Carolina. *Fontem*, 2016 WL 7496721, at *1, 4. Similarly inapposite, in *Lou* the Ninth Circuit explained that "when an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight." 834 F.2d at 739.

In *Signal IP Inc. v. Volkswagen Group*, No. LA CV14-03113, 2015 WL 5766170, at *3 (C.D. Cal. Jan. 20, 1015), the Court noted that the "strong presumption" in favor of a plaintiff's choice of forum may be rebutted by "various circumstances, including when the party who has selected the challenged forum does not reside there, whether there is some suggestion of forum shopping by the non-moving party and when the chosen forum lacks a significant connection to the activities alleged in the Complaint." Here, Pollard has not asserted that Nanografix has engaged in any form of forum shopping and it is now clear that Pollard is selling Accused Tickets in this District. In *Signal*, there was "some indicia" of forum shopping where the Plaintiff incorporated in California two months before filing suit and the design and engineering of the accused vehicles occurred outside the district. *Id.* While the Court noted that although collectively "these facts dilute some of the presumption in favor of Plaintiff's choice of forum," "given its significance in the balancing test, this factor still weights against transfer." *Id.* At a minimum, the same type reasoning should apply here. Thus, this factor weighs against transfer.

### D. The Parties' Contacts with the Forum and the Contacts with the Chosen Forum Relating to Plaintiff's Cause of Action

Nanografix has extensive contacts with California and Los Angeles. Pollard has not addressed its contacts with California and Los Angeles, for to do so would highlight its extensive contacts with California noted above. This factor weighs against transfer.

With respect to the contacts with California relating to Nanografix's claims, for Nanografix, one of the inventors of the '494 Patent, Daniel Lieberman, resides in

16

California. The invention was conceived during a time that Mr. Lieberman was traveling extensively between California and Mexico. (Lieberman Decl. ¶ 16). The '494 patent was prosecuted before the USPTO by attorneys in California. The patent was originally owned by Holowebs, LLC, which is a California limited liability company. Nanografix's relevant documents are located in California.

Further, as quoted within Pollard's Motion citing *Signal IP Inc. v. Volkswagen Group*, 2015 WL 5766170, at **3-4 (C.D. Cal. Jan. 20, 1015):

> "[I]n patent infringement actions, the preferred forum is that which is the center of gravity of the accused activity. . . The district court ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production. . . This location is often where the development, research, and marketing of the accused product occurred. . . This makes sense because in determining whether infringement has been established, the principal target of inquiry is the design and construction of the accused product. The trier of fact will be asked to compare the claims in the patent with the accused product— examining its development, its components, its construction, and how it functions." (citations omitted).

Pollard's "center of gravity" argument suffers a serious flaw. Pollard relies on Mr. Ward's Declaration and argues that "the vast majority of witnesses with knowledge concerning the manufacture, development, and marketing of the Scratch FX tickets are located in Ypsilanti, Michigan while a handful of other relevant witnesses are located in Winnipeg, Canada. (Ward Decl. ¶¶ 4, 6-7)." (Dkt. 26-1, p. 11). Mr. Ward's averments, however, do not support this assertion.

Nowhere did Mr. Ward reference anything about a "majority" of Pollard's witnesses being located in Ypsilanti. Instead, he stated that "there are several Pollard employees working at Pollard's Ypsilanti, Michigan facility who have knowledge of the manufacture, design, marketing and sale of the Scratch FX tickets" and he identified himself, Scott Stalker, David Thomas and Donna Priziotti. Pollard states that it expects to call only three of them at trial, Mr. Ward, Mr. Stalker and Mr. Thomas. Mr. Ward states that three of these people all have various responsibilities

concerning the manufacture of the accused Scratch FX tickets, but he does not state that they have any knowledge about or responsibility for the "development, research, and marketing" of the accused Scratch FX products.  The one witness Mr. Ward identifies in Michigan with any type of marketing responsibility for Scratch FX tickets is Ms. Preziotti with respect to the Michigan Lottery.  Pollard did not indicate it expects to call her at trial.

Mr. Ward's Declaration also ignores that Pollard markets and sells Scratch FX tickets to numerous other state lotteries, including California, Maryland, Texas, Iowa, Idaho, and Virginia, and it has not referenced any persons in the Ward Declaration with respect to those States. All of the marketing press releases are issued from Winnipeg, Canada and identify different Pollard marketing people. (Meyer Decl. ¶ 7-12).

Tellingly, Mr. Ward identifies a Pollard employee in Winnipeg, Carol Dulle, that is the person "most knowledgeable about the financial aspects, including profitability, of the Scratch FX tickets that Pollard makes and sells in the United States." [Ward decl, p. 6]. Mr. Ward also states that "there are Pollard employees and former employees in Winnipeg who are knowledgeable about the development of and manufacturing process for the Scratch FX tickets." (Ward Decl, paragraph 7). Nowhere did he quantify the number of such Winnipeg witnesses or address the degrees of their involvement in the infringing activities. He specifically identifies only one of them, Lyle Scrymgeour.  Mr. Scrymgeour is also named as an inventor on Pollard's patent marked on the back of its Scratch FX tickets.  As noted above, the Pollard patent identifies 5 inventors, all of whom reside in Canada. (Meyer Decl. ¶ 6).

Mr. Ward also avoided any reference of the Accused Tickets being sold in California that were "Made in Canada."

The narrow descriptions and disclosures concerning Pollard's Ypsilanti witnesses, couple with Pollard's non-transparent discussion of its Winnipeg witnesses and its decision not to reference the Accused Tickets that were "Made In Canada"

18

now being sold in California, strong suggest or gives rise to the presumption that the "center of gravity" for the accused activities relating to the Scratch FX tickets is not in Ypsilanti but in Winnipeg. Thus, this factor is neutral at best given Pollard's failure to meet its burden.  See Signal IP, Inc. v. Volkswagen Grp. Of Am., Inc., No. 14-cv-3133, 2016 WL 5766170 at *4 (C.D. Cal. Jan. 20, 2015)(no center of gravity in the transferee district; this factor weighed against transfer).

With respect to the cases cited by Pollard in support of its "center of gravity" argument, the facts were very different from the ones here.

In the *Signal* case, relied upon by Pollard, the Court found that there was no center of gravity in the transferee district and found that factor weighed against transfer.  *Signal IP, Inc. v. Volkswagen Grp. Of Am., Inc.*, No. 14-cv-3133, 2016 WL 5766170 at *4 (C.D. Cal. Jan. 20, 2015)

In *In Re Genentech,* the Federal Circuit issued a writ of mandamus and transferred a case from the Eastern District of Texas to the Northern District of California.  Concerning the convenience of the witnesses, the Federal Circuit noted that there were no witnesses or parties within Texas and there were at least 10 witness and 3 non-party witnesses that had knowledge of material facts relevant to the case in the Northern District of California.  There were also at least 4 witnesses, including 3 non-party witnesses, that were outside of the Northern District of California, but within the state of California.  *In re Genentech, Inc.*, 566 F. 3d 1338, 1343 (Fed. Cir. 2009).  Concerning the convenience of the parties, the court noted that two of the three parties were headquartered in the transferee venue or San Diego, California. The Court also noted that there would be a "significant and unnecessary burden on the petitioners" to transport documents if the case was not transferred.  *Id.* at 1346.

In *In re Hoffman-LaRoche*, the Federal Circuit also applied 5th Circuit law and issued a writ of mandamus and transferred a case from the Eastern District of Texas to the Eastern District of North Carolina when Novartis, a company headquartered in California sued a number of companies in the Eastern District of Texas for

19

infringement of a patent related to a drug called Fuzeon. There was no meaningful connection of the case to Eastern District of Texas except that in anticipation of litigation, plaintiff's counsel shipped 75,000 pages of documents in electronic format had been shipped to plaintiff's counsel's office in the Eastern District of Texas, which the court found was manipulative.  The accused products were also developed in the transferee district and there were at least 4 non-party witnesses within 100 miles of the transferee district.  *In re Hoffman-LaRoche, Inc.*, 566 F.3d 1333, 1336-1337 (Fed. Cir. 2009).

**E. The Comparative Costs of Litigating in the Two Forums; The Convenience of Witnesses**

Pollard has identified only three or four witnesses in Ypsilanti that would be required to travel to Los Angeles if this case is not transferred.  Of course, these individuals could be deposed in Michigan.  But the cost of flying three or four witness from Detroit to Los Angeles and obtaining them lodging would be negligible to a company of Pollard's means.  Further, the Winnipeg witnesses will have to travel regardless, and Pollard has failed to make any showing that there is any meaningful differences if they travel to Los Angeles or Detroit.  This factor is essentially neutral or otherwise deserves little if weight given the conclusory arguments by Pollard without any underlying support.  *See Miracle v. N.Y.P. Holdings, Inc.*, 87 F. Supp. 2d 1060, 1073 (D.Haw. 2000) ("Defendants, in addition, have failed to demonstrate that it would be prohibitively expensive or difficult for Defendants to travel to Hawaii to litigate this action. . . . The Post is a large corporation that could more easily travel to Hawaii to litigate than could Plaintiff travel to New York."); *Digitech Image Technologies, LLC v. Leica Camera AG*, No. 12-01677, 2012 WL 6062749, at *2 (C.D. Cal. Dec. 5, 2012) (factor weighed in favor of smaller company; "Where a disparity between the parties exist, such as an individual plaintiff suing a large corporation, the court may also consider the relative means of the parties in

determining whether to transfer") (citing *Hernandez v. Grabel Van Lines*, 761 F.Supp. 983, 989 (E.D.N.Y. 1991)).

Further Pollard's arguments regarding witness convenience are incomplete for it has not specifically referenced any non-party witnesses[3] in its Motion and such arguments are premised on the suggestion that it would need to subpoena its own employees in Ypsilanti (Dkt. 26-1, at 11).  As explained in *Allstar Mktg. Group, LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1132-33 (C.D. Cal. 2009):

> The court accords less weight to the inconvenience of *party* witnesses, however, as they can be compelled to testify regardless of the forum in which the lawsuit is ultimately litigated. See, e.g., *Applied Elastomerics, Inc.,* 2006 WL 2868971 at *4 (citing *STX, Inc.,* 708 F.Supp. at 1556 (discounting the inconvenience to witnesses who were employees of one of the parties because they could be compelled to testify)); *Hartfield v. Offshore Oil Services, Inc.,* No. CV G-06-275, 2006 WL 2670984, *6 (S.D.Tex. Sept. 14, 2006) ("The Court reiterates that the convenience of key witnesses who are employees of the defendant requesting transfer is `entitled to less weight because that party will be able to compel their testimony at trial,'" quoting *Continental Airlines, Inc. v. American Airlines, Inc.,* 805 F.Supp. 1392, 1397 (S.D.Tex.1992)); *Worldwide Financial* 1133*1133 *LLP v. Kopko,* No. CV 03-0428 DFH, 2004 WL 771219, *3 (S.D.Ind. Mar. 18, 2004) ("The courts ordinarily assume that the parties will be sufficiently motivated to have their own partners or employees or other allies appear for trial wherever it might take place. Parties may use Rule 45 of the Federal Rules of Civil Procedure to conduct discovery all over the United States, so the principal concern along these lines is to make non-party witnesses available for trial. The aim is to minimize the risk of `trial by deposition'" (citations omitted)).
>
> ***
>
> Because none of the parties has identified non-party witnesses, this factor adds little to the court's analysis. Certainly, defendants have not demonstrated that the factor favors transfer.

---

[3] In paragraph 7 of the Ward Decl., Ward referenced that Pollard's Winnipeg witnesses and "[t]hese employees and former employees include Lyle Scrymgeour." (Dkt. 26-2, at 3).  But nowhere in its papers has Pollard affirmatively identified a non-party witness and described with any clarity what the anticipated testimony of any such non-party witnesses would be.

For these reasons, this factor also weighs little, if any, in favor of transfer

### F. Availability of Compulsory Process to Compel Attendance of Unwilling Non-Party Witnesses

This factor does not weigh in favor of transfer.  Pollard has not identified any non-party witnesses, much less any non-party witnesses located in Michigan (or even the United States).

### G. Ease of Access to Sources of Proof

Pollard acknowledges that it has relevant documents on both Ypsilanti and Winnipeg. (Ward Decl. ¶ 5, 100). "[I]f the motion is based on the location of records and documents, the movant must show particularly the location, difficulty of transportation, and the importance of such records." *Bohara v. Backus Hosp. Med. Ben. Plan*, 390 F. Supp. 2d 957, 963 (C.D. Cal. 2005). Pollard has presented no evidence of any difficulty in transporting its documents or records from Michigan or Winnipeg to any location for this case. This factor therefore does not favor transfer. *Allstar Mktg. Group, LLC,* 666 F. Supp. 2d at 1133 (C.D. Cal. 2009) ("Defendants argue that their computers, sales records and customer lists are located in Wisconsin. They proffer no evidence, however, regarding the size or nature of the records. At best, therefore, the factor is neutral.").

Pollard also contends that the equipment used to manufacture the Accused Tickets is in Michigan.  But whether this case proceeds in California or Michigan will not make inspection of Pollard's facilities any easier for either party and Pollard has not made any showing why that makes transfer appropriate.  This argument also ignores that it also has equipment to make Accused Tickets in Canada as indicated by the Holiday Sparkle Tickets currently on sale in California.

Pollard also suggests that it would be easier for a Court in the Eastern District of Michigan to visit its plant.  But Pollard has made no showing why any such visit would be likely or needed.

**H. Interests of Justice**

The Central District of California has a strong interest in having this case decided here.  Nanografix is a California corporation and is being harmed by Pollard's infringement through its sales of the Accused Tickets in California and elsewhere. California has an interest in discouraging injuries that occur within the state. *See Beverly Hills Fan* Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed. Cir. 1994).

Further, this Court may consider "whether a trial may be speedier in another court because of its less crowded docket." *Gates Lear Jet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir.1984). To measure congestion, courts compare the two fora's "median time from filing to disposition or trial." *Costco Wholesale Corp. v. Liberty Mutual Lns. Co.,* 472 F. Supp. 2d 1183, 1196 (S.D. Cal. 2007).

Here, for the period January 1, 2009 through the present, there have been sixty patent trials in the Central District of California with a median time to trial of 2.25 years (822 days). (Meyer Decl. ¶ 27 and Exhibit Y thereto). In contrast, during that same period, there have been seven patent trials in the Eastern District of Michigan, which apparently was not a sufficient sample for Lex Machina to calculate a median time to trial.  Instead, the report simply marked on the same timeline the time it took those seven cases to reach trial.  That chart shows that five of those seven cases did not reach trial until after 4.5 years, twice the median time to trial in this District. (Meyer Decl. ¶ 27). For a small company like Nanografix of limited means, this prospect of facing a case twice as long as would likely occur here is highly troubling and prejudicial. This factor therefore militates against transfer.

## IV.    <u>CONCLUSION</u>

This case involves a small California company, whose owner is the inventor of the '494 Patent at issue, asserting patent infringement claims against Pollard, a Canadian company. There is no dispute that venue is proper here in the Central District of California.  Pollard's Motion seeking to transfer this case is premised on the wrong standard and an incomplete consideration of the various factors relating to where the center of gravity of the accused activities may lie. Nanografix's choice of venue is entitled to deference and the parties and the claims in this action have strong ties to the State of California.  Relatively speaking, Nanografix faces far greater hardships if the action is transferred to the Eastern District of Michigan than any alleged hardships to Pollard if the action proceeds in the Central District of California. The interests of justice also favor proceeding in the Central District of California. Pollard certainly had no hesitation seeking business with the California Lottery regarding the Accused Tickets, and its claims that California is now an inconvenient forum ring hollow in the face of its long history with the California Lottery.  For these reasons and the reasons stated above, Nanografix respectfully requests that the Court deny Pollard's Motion.


DATED:  November 26, 2018          RESPECTFULLY SUBMITTED,


By:   /s/ *Derek J. Meyer*

**LEONARDMEYER LLP**
Derek J. Meyer (CA Bar No. 278346)
1800 Century Park East, Suite 1400
Los Angeles, CA 90067
Tel: (310) 220-0331
rmeyer@leonardmeyerllp.com

**LEONARDMEYER LLP**
John G. Bisbikis (admitted *pro hac vice*)
Madelaine M. Thomas (admitted *pro hac vice*)
120 North LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (310) 374-8084
jbisbikis@leonardmeyerllp.com
mthomas@leonardmeyerllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on Monday, November 26, 2018, I served the foregoing document(s) described as **PLAINTIFF NANOGRAFIX CORPORATION'S RESPONSE IN OPPOSITION TO DEFENDANT POLLARD BANKNOTE LIMITED'S MOTION TO TRANSFER TO THE EASTERN DISTRICT OF MICHIGAN** as follows:

| | |
|---|---|
| Lauren Schweitzer | Russell E. Levine |
| KIRKLAND & ELLIS LLP | Kourtney Baltzer |
| 333 South Hope Street | KIRKLAND & ELLIS LLP |
| 29th Floor | 300 North LaSalle Street |
| Los Angeles, CA 90071 | Chicago, IL 60654 |
| (213) 680-8400 | (312) 862-2000 |
| lauren.schweitzer@kirkland.com | rlevine@kirkland.com |
| | kourtney.baltzer@kirkland.com |

**(By ECF)** I caused the above-referenced document(s) to be filed with the Electronic Case Filing (ECF) system in the United States District Court for the Central District of California, on all parties registered for e-filing. Counsel of record are required by the Court to be registered e-filers, and as such, are automatically e-served with a copy of the documents upon confirmation of e-filing.

**(Federal)** I declare that I am a member of the Bar of this Court. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: November 26, 2018          By:    /s/ *Derek J. Meyer*